## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

KAREN CAMPBELL MCGAGH )
4307 Regalwood Terrace, )
Burtonsville, MD 20866 )
*Plaintiff* )
)
Vs. )
)COMPLAINT FOR INTENTIONAL
VERIZON INC. )INFLICTION OF EMOTIONAL DISTRESS
1 the Verizon Way )BATTERY, NEGLIGENCE, VICARIOUS
Basking Ridge, NJ 079201 )LIABILITY, AIDING AND ABETTING A
)TORTIOUS ACT DUE PROCESS, AND
HANS VESTBERG, individually )QUANTUM OF DAMAGES
Chief Executive Officer, Verizon )
1 the Verizon Way, )
Basking Ridge, NJ 079201 )
) *Case No.:* 8:25-cv-03536-BAH
VANDANA VENKATESH, individually )
Chief Legal Officer, Public Policy )
1 Verizon Way, )
Basking Ridge, NJ 079201 )
)
CRAIG SILLIMAN, individually )
Chief Legal Officer, Public Policy )
1 Verizon Way, )
Basking Ridge, NJ 079201 )
)
CELLULAR SALES )
1000 Wireless Blvd, Knoxville, TN 37917 )
)
DANE SCISM, individually )
CEO, Cellular Sales )
1000 Wireless Blvd, Knoxville, TN 37917 )

## VERIFIED COMPLAINT

## I. INTRODUCTION

1.  Plaintiff Karen Campbell McGagh brings this action against Verizon Inc., Cellular Sales, Hans
    Vestberg, Vandana Venkatesh, Craig Silliman, and Dane Scism, asserting claims for Intentional
    Infliction of Emotional Distress (Harris v. Jones), Negligence (*Jacques v. First Nat'l Bank of*

-1-

*Md.*), Vicarious Liability (*Cox v. Pepco*), Violation of Due Process, Quantum of Damages, Aiding and Abetting a Tortious Act (*Allegheny Mut. Cas. Co. v. Hanover Ins. Co.*), Spoliation of Evidence (*Klusman v. Copeland*), and Assault (*Lamb v. Hopkins*). Ms. McGagh's claims arise from an assault perpetrated by an employee of Verizon while she was a customer. Defendants' refusal to engage in mediation has necessitated Ms. McGagh's filing of this complaint in the United States District Court for the District of Maryland.

## II. PARTIES

### Plaintiff

2.  Karen Campbell Karen Campbell McGagh, residing at [Your Address], sued Verizon after a store employee assaulted her at their location in Towson, Maryland.

### Defendants

3.  Verizon Inc., a New Jersey corporation with its principal office at 1 Verizon Way, Basking Ridge, NJ 07920, is the primary corporate entity responsible for the actions of its agents and employees.

4.  Hans Vestberg, Chairman and CEO of Verizon Inc., residing at 1 Verizon Way, Basking Ridge, NJ 07920, is liable for decisions that contributed to the alleged misconduct.

5.  Vandana Venkatesh, Executive Vice President and Chief Legal Officer of Verizon Inc., residing at 1 Verizon Way, Basking Ridge, NJ 07920, is liable for failures in her oversight duties regarding legal compliance.

6.  Craig Silliman, former Executive Vice President and Chief Legal Officer of Verizon Inc., can be served at 1 Verizon Way, Basking Ridge, NJ 07920, and may still be held accountable for actions during his tenure.

7.  Cellular Sales, LLC, an authorized Verizon retailer with its principal place of business at 1000 Wireless Blvd, Knoxville, TN 37917, is liable for its direct role in customer interactions.

8.  Dane Scism, CEO of Cellular Sales at 1000 Wireless Blvd, Knoxville, TN 37917, is responsible for daily operations and employee actions.

### III. JURISDICTION & VENUE

9.  This case falls under the jurisdiction of the United States District Court for the District of Maryland. Federal question jurisdiction is established under 28 U.S.C. § 1331, as the lawsuit addresses violations of Ms. McGagh's due process rights, a matter arising under the U.S. Constitution. Supplemental jurisdiction, under 28 U.S.C. § 1367, allows the Court to also hear related state law claims arising from the same operative facts.

10. Venue is proper in the District of Maryland according to 28 U.S.C. § 1391(b)(1) and (2), as the alleged tortious acts occurred within this district, and at least one defendant resides here. This aligns with established legal precedent, such as *Wagner v. Williams*, which affirms that jurisdiction and venue are appropriately determined by the location of the events and the parties involved in the dispute.

### IV. ACCRUAL AND STATUTE OF LIMITATIONS

11. Ms. McGagh's lawsuit is timely for several reasons. First, under the "discovery rule" in Maryland, as established in *Poffenberger v. Risser*, 290 Md. 329 (1981), the statute of limitations begins when a person knows, or should know, about the injury and its cause. Ms. McGagh did not fully understand the extent of her injuries or how the Defendants' actions, including hiding evidence, contributed to them until recent legal developments. Specifically, she recently learned that the defendant's counsel argued against her claims without viewing all relevant video evidence. This newly discovered information reveals how the defendants' actions caused her injuries and delays the start of the limitations period.

12. Second, the "continuing tort doctrine," recognized in *Doe v. Archdiocese of Washington*, 862 A.2d 291 (Md. 2004), applies here. This doctrine states that if wrongful actions continue, the statute of limitations does not start until those actions cease. The Defendants' misconduct, including the initial assault and the ongoing cover-up, has been a continuous pattern. Each new act of concealing evidence or obstructing justice effectively restarts or extends the limitations period.

13. Finally, Ms. McGagh's parole status created a "legal disability" that prevented her from filing sooner. Maryland law acknowledges that certain situations, such as parole, can temporarily pause the statute of limitations. Her parole restricted her ability to investigate, consult lawyers, and initiate legal action, thus serving as another valid reason why her lawsuit is timely.

14. Due to the discovery rule, the continuing tort doctrine, and the legal disability caused by her parole, Ms. McGagh's lawsuit is filed within the proper legal time limits. Each of these legal principles independently supports the argument that her claims are not time-barred and should be heard by the Court.

## Verizon's Liability for Actions at Cellular Sales

15. Verizon bears legal responsibility for Glen Trebay Larry Carbo's actions at Cellular Sales due to the principles of agency, vicarious liability, and authority, supported by established case law. It's important to note that Cellular Sales' outside counsel said he represented both companies. For example, Ms. McGagh wrote an email to Verizon executives, and Carbo said he told Ms. McGagh to stop contacting "his" clients.

16. Carbo's statement, "stop contacting his clients," unequivocally establishes his representation of Verizon. This declaration binds Verizon to its actions under agency law. By asserting ownership of the client relationship, he acted as Verizon's agent, clearly implying that Verizon was his client. Any reasonable person would interpret this as confirmation of legal representation, making Verizon accountable for Carbo's conduct, including any mishandling of Ms. McGagh's case. This acknowledgment legally equates Carbo's actions with Verizon's, solidifying Verizon's liability for his communications and strategy.

17. Cellular Sales operates as Verizon's authorized retailer, and its stores are branded as Verizon. This creates a scenario where customers reasonably believe they interact directly with Verizon, not a separate entity. This is key to establishing apparent authority in *Herbert Constr. Co. v. Continental Cas. Co.*, 931 N.E.2d 1004 (Mass. App. Ct. 2010), it was held that if a principal's conduct leads a third party to believe an agent has authority reasonably, the principal is bound by the agent's actions. Verizon's extensive branding, customer interaction protocols, and control over its authorized retailers directly contribute to this apparent authority. Customers entering a Verizon-branded store reasonably presume they are engaging with Verizon directly, making Verizon accountable for its employees' actions.

18. Furthermore, Verizon maintains significant control and oversight over Cellular Sales regarding training, conduct standards, and business practices. This degree of control cements the agency relationship.

19. For example, if Verizon failed to ensure a safe environment or neglected to address known issues with employees like Glen Trebay, in that case, Verizon is liable for negligence, as discussed in *Murk v. Best Buy Co.*, 891 N.W.2d 794 (Minn. Ct. App. 2017). Businesses have a responsibility to address known issues and prevent harm to customers. Even though Trebay was technically an employee of Cellular Sales, his position as a Verizon agent means Verizon is indirectly responsible for any harm his actions caused customers.

20. The principle of vicarious liability extends to agents and employees acting within the scope of their employment. In *Ira A. Watson Co. v. Brown*, 152 S.W.3d 427 (Tenn. Ct. App. 2004), the court highlighted that employers can be held liable for torts committed by employees within the scope of their employment. If Glen Trebay's actions occurred while performing his sales duties, Verizon is responsible through its agency relationship with Cellular Sales. Trebay interacted with Ms. McGagh as a Verizon representative, handling her phone and offering assistance. His actions, albeit wrongful, occurred within the scope of his employment duties as a salesman, making Verizon vicariously liable.

21. Specific actions solidify Verizon's responsibility: Trebay's interaction with Ms. McGagh was within the Verizon-branded store, during business hours, and while performing duties associated with Verizon's sales. His holding of Ms. McGagh's SIM card and inappropriate behavior occurred within the context of a Verizon transaction, indicating he acted under Verizon's apparent authority. Verizon's established protocols, training, and brand representation give Cellular Sales the authority to act on its behalf, making Trebay a Verizon agent. This, coupled with Verizon's oversight of Cellular Sales' operations, establishes Verizon's responsibility.

22. The agency relationship, apparent authority, and vicarious liability, supported by case law, establish Verizon's clear legal responsibility for Glen Trebay's actions at the Cellular Sales store. Verizon had a duty to ensure customer safety at its authorized retailers. It breached this duty through inadequate oversight and failure to address known employee misconduct and is thus responsible for the harm caused to Ms. McGagh.

23. McGagh is suing Verizon and Cellular Sales because salesman Glen Trebay assaulted her on July 18, 2017, by holding her SIM card hostage, threatening her, and preventing her from leaving. Security video recorded the assault. Both companies knew of Trebay's erratic behavior, yet allowed him access to customer information, which he used to torment Ms. McGagh. This negligence directly caused the assault and Ms. McGagh's suffering.

24. The security footage undeniably proves assault and battery. Trebay's unlawful detention of her SIM card, unwanted touching, and threats created fear. This wasn't a customer service issue but an abuse of power. Trebay tried to sell non-Verizon products, refusing to return her SIM card until she looked at them. Maryland law defines these actions as assault and battery, warranting damages for Ms. McGagh's emotional distress.

25. Employee inaction during the assault indicates negligence and tacit approval within Verizon and Cellular Sales, implicating vicarious liability. An employee's statement about Trebay's pattern of abuse towards women further solidifies the negligence claim.

26. Verizon's public advocacy for criminal justice reform contrasts sharply with its inaction in Ms. McGagh's case, revealing hypocrisy. Craig Silliman's statements ring hollow when juxtaposed with the company's refusal to help a victim of their employee's assault, warranting punitive damages.

27. Shockingly, Ms. McGagh was unjustly charged with perjury after reporting her assault. Following the Freddie Gray incident, the Department of Justice found "gender bias" in Baltimore policing and prosecution, with officers asking victims if they were "messing up that guy's life." Ms. McGagh experienced similar treatment.

28. She unknowingly became entangled in police misconduct and corporate cover-up. Her 2017 conviction relied on one video angle that showed eleven assaults but missed two crucial ones. The defendants' attorney recently revealed three additional video angles existed; their suppression obstructed justice and contributed to her wrongful conviction, forming a basis for claims of intentional infliction of emotional distress and negligence.

29. The actions of defendants' attorney, C. Larry Carbo, represent a shocking dereliction of duty. Despite defending Verizon and Cellular Sales, Carbo admitted he "never even watched" the central video evidence. This is gross negligence or willful blindness. He fought Ms. McGagh while communicating with a prosecution known for retaliating against assault victims, ignorant of the incident he was defending. This exposes Verizon and Cellular Sales to significant liability. Carbo relied on a junior technician from the assault location without independent verification.

30. Carbo claims three tapes were sent, but the court only received one. This discrepancy, combined with the destruction of the missing footage, raises suspicions of obstruction. The lost footage

likely contained intimate details of the assaults. Carbo's failure to ensure evidence integrity and his neglect in reviewing the available footage paint a disturbing picture.

31. Carbo's actions were a direct assault on Ms. McGagh. Verizon and Cellular Sales exhibit a pattern of negligence, intentional infliction of emotional distress, and obstruction of justice. They maintain a public image while employing outside counsel to cover up unlawful behavior.

32. Verizon faces significant criticism for inadequate employee supervision, stemming from insufficient policies and training. Existing policies reportedly conflict with constitutional requirements, as evidenced by employee comments on public review platforms indicating a culture where sexual harassment is tolerated. The company also faces discrimination lawsuits, including a $20 million settlement over its failure to accommodate disabled workers. Employee reviews highlight an unprofessional workplace culture, particularly towards women, with allegations of sexism and sexual harassment.

33. These issues stem from systemic failures: inadequate policies, training, supervision, data collection, analysis, and accountability. Verizon and Cellular Sales reportedly lack meaningful accountability systems, discourage and misclassify complaints, and conduct minimal investigations. Employees fear retaliation for reporting misconduct. Ms. McGagh's case exemplifies this, with four employees witnessing the assault without intervening.

34. Other examples of accountability issues include Craig Silliman, who refused to help Ms. McGagh despite advocating for social justice, and Carbo, who reportedly failed to verify information sent to Baltimore and had unusual interactions with the State's attorney. Poor coordination is evident in Carbo's unawareness of Craig Silliman's justice campaign.

35. Verizon and Cellular Sales suffer from inadequate staff training, particularly in sexual harassment prevention. Ineffective data collection and insufficient staffing lead to overworked employees, low morale, and poor decision-making. To address these issues, both companies must invest in enhanced training, policy alignment, improved data management, and sufficient resources and staffing

## V. BACKGROUND

36. The dark secrets regarding Baltimore County's treatment of women who report assault were first revealed in 2010 during a *Baltimore Sun* investigation. Multiple reports emerged of women being terrorized by the police after reporting assaults, and it was found that the Baltimore

County police forced women to sign papers stating they would not press charges against their attackers.

37. *The Sun*'s investigation also highlighted that Baltimore County dismissed more assault reports as unfounded compared to any other city of its size. Baltimore prosecutor on woman reporting rape: 'Seems like a conniving little whore,' the *Washington Po*st wrote in a August 11, 2016.

38. After a Baltimore woman reported her rape to police, the prosecutor on the case shared his thoughts with an officer. "I am not excited about charging it," the unnamed official wrote in an email. "This victim seems like a conniving little whore." "Lmao!" the officer wrote back. "I feel the same."

39. The Justice Department concluded that "gender bias" had influenced investigations. In their interviews with women reporting sexual assault, investigators noted that BPD officers would ask questions such as, "Why are you messing up that guy's life?"

40. The DOJ investigation provides an extraordinary insight into the inner workings of a city police force. It was initiated after the 2015 death of Freddie Gray, a 25-year-old Black man who sustained fatal injuries while in the back of a police van.

41. In the fall of 2017, Towson University student Anna Borkowski and a friend were drugged and raped by three members of the UMBC baseball team. The two victims reported the incident to police, and Borkowski went to the hospital for an exam. The exam revealed "vaginal lacerations" consistent with a sexual assault, but County police failed to collect evidence.

42. Then, less than 24 hours after the attack, Mrs. Borkowski's case inexplicably closed. Her assault was "declassified" due to "extraordinary circumstances." There are no records in the investigative files reflecting this information. Police later interviewed the suspect, who admitted to having sex with both women while they were incapacitated but said they "didn't understand what the problem was." Although they acknowledged the possibility of arresting the suspects, prosecutors ultimately declined to press charges.

43. When Borkowski eventually tried to charge the attacker in District Court, the Defendant was found not guilty. The first court commissioner she contacted called the sex crimes unit and was told the request for prosecution was denied. The Defendants took it further when Borkowski submitted her affidavit to another court commissioner. Police and prosecutors moved to prevent the service of subpoenas, dismiss the lawsuit filed by Borkowski, and launch an investigation into Borkowski.

44. On Schellenberg's order, Baltimore County employee Christine Burrows contacted the Baltimore County police officer responsible for serving the subpoenas on the three men and instructed him not to serve them, an unethical and illegal act that defies logical explanation. Shortly after that, Schellenberg dispatched two investigators and a patrol officer to Borkowski's home in Baltimore City, warning Borkowski that if she persisted, "they would file criminal abuse charges against her."

45. The Defendants wanted to punish Borkowski until she broke and stopped pressing charges. Next, they went after her sister. Borkowski's sister, Emily, accepted an internship with the District Attorney's Office. In April 2018, she was working in the domestic violence unit when the Defendants had Borkowski's sister ruthlessly investigated. According to emails, the Baltimore County investigator admitted to prosecutors that he "stalked" Anna Borkowski to uncover the connection between Anna and Emily Borkowski. Once they found out the two women were related, they fired Emily Borkowski.

46. The Defendants said the firing was in response to what Borkowski's lawyers called allegations of "inappropriate conduct." Baltimore County ultimately admitted that punishing Anna Borkowski was "unjustified retaliation." The Defendants settled out of Court. Ms. McGagh's case emerges under this backdrop.

**Mrs. McGagh**

47. It all began on April 24, 2017, at 6 p.m. when Ms. McGagh walked into a Verizon store on York Road in Towson, expecting a routine service appointment for her cellphone. However, what she experienced was far from ordinary, quickly turning into a distressing ordeal and assault that she detailed in a subsequent report.

48. Upon her arrival, she encountered a salesperson who brought her to the back of the store. He "had alcohol on his breath," which immediately made her uneasy. As the interaction progressed, the salesman's behavior became increasingly bizarre, inappropriate, and unsettling.

49. After bringing Ms. McGagh to the back of the store, he motioned her to sit down, pulled his chair around the desk, and moved it right next to her. Other salespeople sat across from their customers, away from them. Ms. McGagh said the salesman sat too close and "touched [or 'brushed'] the inside of my leg." He moved closer every time she moved away so their legs wouldn't touch.

50. His comments were scary. He asked her, "Are you single?" "I know where you live." "I can pull up your address." "I'll call you tomorrow."

51. The situation escalated when the salesman took the SIM card from Ms. McGagh's cellphone, holding it hostage. Instead of returning the SIM card, he attempted to leverage it to coerce her into purchasing a new phone and extending her contract. This act of holding her SIM card hostage added a layer of manipulation and control to the already distressing situation.

52. While controlling access to her SIM card, the salesman tried to sell McGagh various non-Verizon items. He retrieved a Fitbit, a sweater, and a watch from under his desk and displayed them as if conducting a private sale. These actions violated store policies and compounded McGagh's discomfort and fear.

53. He refused to give her back her SIM card until she looked at all the wares he kept in a box under his desk.

54. Ms. McGagh's decision to stay and comply with the salesman's demands was influenced by a complex interplay of professional, personal, and emotional factors. Her acute awareness of the potential misuse of images and data and the immediate threat posed to her professional contacts and personal photos created a dire situation where she felt she had no choice but to comply.

55. Professionally, Ms. McGagh had just completed a significant project involving the 9000 victims of Dr. Nikita Levy, a physician notorious for secretly taking pictures of women using a hidden camera. This experience made her profoundly aware of the potential for abuse when sensitive images fall into the wrong hands. She had seen firsthand the devastating impact such violations could have on individuals' lives. This professional background gave her a heightened sense of urgency and fear regarding the potential misuse of her images and data.

56. On a personal level, Ms. McGagh was deeply concerned about the safety and privacy of her family members, including her children, nieces, and nephews. The idea of exposing them to the same kind of threats she had worked so hard to protect others from was unbearable. She understood the potential dangers that could arise from even a single photo falling into malicious hands, and she wasn't willing to take any risks regarding her loved ones.

57. Emotionally, the situation was exacerbated by the salesman's erratic behavior. He had already demonstrated that he was unhinged, adding a layer of unpredictability and danger to the encounter. Ms. McGagh's fear for her immediate safety, professional knowledge, and personal

concerns left her feeling trapped. The instinct to protect herself and her family overrode any other considerations, compelling her to comply with the salesman's demands.

58. After the salesman made good on threatening to call her at home, she called the police. While struggling to articulate what happened, the policeman who came to her house said it sounded like sexual assault. She suggested a scary warning from the police, but the officer sent to her house suggested he needed more. She wrote a statement of charges.

59. When Ms. McGagh's case reached the Baltimore State's Attorney's office, she received a call from Lisa Dever, a high-ranking State's Attorney who she would later learn was the architect of retribution to women who reported assault. Dever asked Ms. McGagh to come to her office to describe the incident in detail. Before leaving, Dever assured Ms. McGagh that she would subpoena the Verizon videotape that captured the incident, suggesting a thorough investigation would follow.

60. A few weeks later, Ms. McGagh was arrested, taken to a Baltimore County jail, and charged with making a false statement to a police officer and perjury by affidavit.

61. The one silent store video showed eleven instances of assault, but not two intimate ones. Dever used a silent video to decide to drop Ms. McGagh's case and press charges against her.

62. Three years later, Ms. McGagh learned that other cameras in the store that day could have captured the missing instances and the salesman's threatening remarks. She also discovered that the footage from those cameras had been destroyed before she was charged.

63. Dever handed the case to two men in the Cyber Crimes unit with no training or familiarity with sexual assault cases: Detective Brian Wolf and Prosecutor Adam Lippe. The men worked all their cases together and had been chastised for trying cases with no evidence. Adding to the case's complexity, Ms. McGagh discovered Lippe and Wolf had a secret business arrangement, and Lippe appeared prominently on Detective Wolf's company website. This relationship had never been disclosed during the investigation or court proceedings.

64. Wolf and Lippe created two falsified police reports—an original and a supplemental. The supplemental report said Wolf learned about the case after receiving an anonymous phone call from the Citizens' Complaint Bureau. Another detective with an office at the Courthouse will testify[1] that it's impossible because there is no Citizens' Complaint Bureau.

---

[1] Please see the documented conversation in evidence where the detective admitted there is no Citizen's Complaint Bureau,

**Prosecutorial and Police Misconduct Right From the Start**

65. After reporting an assault at the Verizon store, Ms. McGagh was contacted by Lisa Dever from the State's Attorney's office, who indicated that the office would subpoena the relevant videotapes from Verizon.

66. Dever, the architect of retaliation against women, disclosed the incident to her colleague, Suzanne Cohen. Subsequently, Dever informed Lippe, who then engaged Detective Wolf, with whom he shared a secret business relationship, to file charges. Detective Wolf falsely claimed in the police report that he learned about the assault from an anonymous call from a concerned citizen. Examination of phone records would reveal that no such call occurred.

67. The State's Attorney's office reportedly received only one camera view of the assault, while Verizon and Cellular Sales claimed they provided three. Experts confirm that the missing camera views probably captured crucial details of the assault, indicating that someone deliberately hid this evidence from Ms. McGagh and her defense attorney.

68. The suppression of this evidence severely prejudiced her case, potentially leading to wrongful accusations and legal battles that could have been avoided had all facts been presented. It is imperative to determine who concealed these important videos and why, as this action undermined the integrity of the legal process and directly harmed Ms. McGagh.

69. If the assault had not occurred, Ms. McGagh would not have been targeted by the Baltimore County State's Attorney. It's essential to recognize that Verizon and Cellular Sales played a significant role in this situation, as the incident began with an employee assaulting her in their store, which led to the legal issues she faced.

70. Verizon and Cellular sales are responsible for Ms. McGagh's harm because their employee, while on duty, assaulted her in a Verizon-branded store. Furthermore, their failure to provide all video evidence of the assault negatively impacted Ms. McGagh's case and led to her wrongful accusation. This withholding of evidence suggests an attempt to conceal what happened and avoid liability, indicating a failure to protect Ms. McGagh as they should have. Essentially, both the employee's actions and Verizon's handling of the evidence contributed to the harm suffered by Ms. McGagh.

**Faulty and Misleading Evidence**

71. ASAs Lippe and Detective Wolf, untrained in sexual assault cases, led an investigation that disregarded proper protocol by sending only one male officer. They fabricated a police report, leading to Mrs. McGagh's wrongful conviction despite evidence of misconduct.

72. While Mrs. McGagh was incarcerated, her home was robbed and destroyed by squatters. Detective Wolf deliberately classified these crimes as "suspicious circumstances," preventing charges. An officer documented Wolf's order.

73. Exonerated in 2020, Mrs. McGagh faced continued harassment. Senator Chris West contacted Shellenberger, who refused to act despite undeniable robberies and property destruction. The squatters, seeking to remain, fabricated false charges of child abuse against Mrs. McGagh, which were dismissed.

74. Shortly after, Lippe, Dever, and Shellenberger issued a false arrest warrant for parole violation to silence Mrs. McGagh, a national publicist exposing their hidden business relationship with Wolf, a fake PSI, and a falsified police report. The warrant was dropped after Mrs. McGagh provided proof of exoneration, intensifying their retaliation.

75. Dever, Shellenberger, Cohen, and Lippe destroyed vital evidence by intentionally destroying two of three camera angles showing the assaults, backdating the case record, and failing to record the destruction until 2024. Verizon confirmed three angles existed, but only one was shown in court.

76. Officer William Tilghman's attempts to file charges were obstructed by clerks, demonstrating systemic obstruction.

77. During her wrongful conviction, Mrs. McGagh's home was unlawfully foreclosed. Lippe intervened, misleading her mortgage company and law firms, delaying document processing, and thwarting her legal efforts to contest the foreclosure.

78. Mrs. McGagh was illegally evicted based on false representations, despite holding title to her home. She was locked out, a trap designed to violate probation. She held title until January 2024.

79. Ultimately, Mrs. McGagh's home sold for $950,000, yet she received no proceeds. This case exemplifies a severe miscarriage of justice, where legal norms were disregarded to strip Mrs. McGagh of her property and rights.

**State Acknowledges Lying during Mrs. McGagh's Post-Conviction**

80. Mrs. McGagh suffered significant harm due to Verizon and Cellular Sales' negligence. Lippe, a Verizon employee, provided false statements and admitted to perjury, leading to Mrs. McGagh's wrongful 8.5-year prison sentence. Incomplete video evidence and Lippe's continued false statements, lacking factual basis, further undermined Mrs. McGagh's credibility. Lippe is suspected of using back channels to spread misinformation, compromising the legal process. Verizon and Cellular Sales' unchecked negligence and Lippe's manipulative practices directly caused Mrs. McGagh's unjust imprisonment and distress. They must be held accountable for their role in this injustice and rectify the harm.

**The Supreme Court of Maryland**

81. Maryland's Supreme Court failed to protect Mrs. McGagh's patient confidentiality by relying on a fictitious doctor's false statement without her consent or consulting her actual physician. This error, which the court did not acknowledge or correct, significantly undermined Mrs. McGagh's credibility in a perjury case where she was accused of trying to deceive the court. The fake doctor's statement considerably influenced the court's perception of her honesty and the integrity of her evidence.

82. This situation became even more serious when the false statement was cited by law schools and news outlets, resulting in lasting damage to Mrs. McGagh's reputation and affecting the outcome of her case and how the legal community views similar situations. In response, Mrs. McGagh took a respectful approach to set the record straight by contacting the Chief Justice's clerk, Amanda Miller. She was assured the information would be passed along but received no further communication. Desperate to hear her voice, she emailed all the Supreme Court justices, but again, there was no response. This led her to file a Writ of Certiorari, requesting the Maryland Supreme Court to address its mistake.

83. Mrs. McGagh presented evidence proving the falsehood of the claims made against her, yet on March 25, 2024, the court denied her Writ, stating she hadn't demonstrated that correcting the false statements was in the public's best interest.
   ision isn't seen as beneficial for the public, then what truly is?

**Corporate Stolen Valor**

84. While this was happening Craig Silliman, as Chief Legal Officer of Verizon, publicly advocated for criminal justice reform. He highlighted the issues of mass incarceration in the U.S., particularly for nonviolent offenses and the disproportionate impact on African Americans and Latinos. He emphasized that individuals incarcerated due to inability to pay bail or for minor offenses can face lifelong job impacts, leading to a downward spiral affecting families and communities.

85. Silliman also points out that many formerly incarcerated individuals struggle to secure housing, education, and employment due to the stigma of their prior incarceration, even after paying their debt to society. He notes that many lack awareness of reforms allowing criminal records to be sealed or expunged, are overwhelmed by the application process, or lack competent legal counsel.

86. Verizon, under Silliman's leadership, publicly supported the First Step Act, a significant federal criminal justice reform legislation. He expressed the company's commitment to improving the future for incarcerated individuals and returning citizens. This advocacy extends to offering services for misdemeanors, which aligns with the type of charges Ms. McGagh received.

87. He was informed of Ms. McGagh's situation via direct communication when she called him, and subsequently, she sent emails detailing her plight to every corporate executive at Verizon. Ms. McGagh has direct evidence that these emails were received, as Carbo himself, in a fit of anger, explicitly told her to "stop calling his client - Verizon." This statement not only confirms receipt of the communications but also underscores Carbo's direct involvement and awareness of the situation.

88. *Craig Silliman: "As a lawyer, I am both the beneficiary and the custodian of the legal system in this country, so I must care about whether that system is living up to the ideal of impartial justice that we claim. The data on mass incarceration in the U.S. is sobering. We incarcerate an estimated 2.2 million people in the U.S., which is more than any other country in the world, and most of those are incarcerated for nonviolent offenses. Nearly half a million people have not been charged with a crime but are in jail because they don't have the money to pay bail. And studies show that African Americans and Latinos are at greater risk of being incarcerated for minor offenses than other Americans. When an individual ends up incarcerated simply because*

*he cannot afford bail, or for a minor offense that wouldn't be brought against another citizen, it can lead to job losses and other impacts that can trigger a downward spiral leading to separated families, broken communities, and more that impact all of us.*

89. *Even after people leave prison, they face significant challenges. Although they have paid their debt to society, they struggle to secure housing, education, and employment due to the stigma of their prior incarceration. An individual from a poor neighborhood who is charged with something as simple as possession of marijuana, which is, let's admit it, behavior engaged in by many citizens, can have his job prospects impacted for life. We can and should do better.*

90. *Similarly, many states have passed reforms that allow formerly incarcerated individuals to apply to have their criminal records sealed or expunged. Unfortunately, far too few people receive the relief they are entitled to under these laws. Many lack awareness of the reforms, are overwhelmed by the complexity of the application process, or lack competent legal counsel. That's where we come in.*

91. *At Verizon, operating as a responsible business means making a difference. Last year, we publicly supported passage of the First Step Act, the most significant federal criminal justice reform legislation in years. Now, working with our partners, we hope to improve the future for incarcerated individuals and returning citizens. We are excited to roll up our sleeves to make change happen.*

92. The Defendants couldn't have said it better. They describe Ms. McGagh's situation perfectly: "*An individual from a poor neighborhood who is charged with something as simple as possession of marijuana, which is, let's admit it, behavior engaged in by many citizens, can have his job prospects impacted for life.*"

93. The assertion that the Defendants' outside counsel, Larry Carbo, did not know Chief Legal Officer Craig Silliman is perplexing. Given the significant billing, Carbo's ignorance of Silliman suggests dishonesty or negligence. This raises serious questions about the competence and integrity of the Defendants' legal representation.

94. Craig Silliman's statement that "every person deserves a fair chance" is undermined by the Defendants' failure to preserve evidence that could have helped Ms. McGagh. This negligence exposes a stark contrast between Silliman's public declarations and the company's actual behavior, revealing a troubling disregard for justice.

95. Silliman's lack of response to Ms. McGagh's urgent requests and his failure to address her

struggles contradict his stated ideals. This disregard for her situation exposes a systemic issue—a lack of genuine care for those impacted by the justice system. Silliman and the Defendant directly contributed to the injustices he claims to oppose by allowing critical evidence to be lost. This hypocrisy weakens his advocacy and intensifies the suffering of individuals like Ms. McGagh.

96. Silliman cannot claim to be unaware of Ms. McGagh's situation, as she directly contacted him. She even used "corporate stolen valor" to describe the Defendants' actions. This phrase highlights the sense of betrayal felt when the justice system fails. Silliman's anti-incarceration rhetoric appears hollow when juxtaposed with his inaction against the injustices within his company.

## Larry Carbo - the Defendants' Outside Counsel & Bad Cop

97. Attorney Carbo's failure to review all available video evidence, despite its critical importance to the case, and his subsequent vigorous opposition to Ms. McGagh's claims, constitutes a troubling form of concealing exculpatory evidence. This conduct is not merely negligent but suggests a deliberate disregard for facts that could have supported Ms. McGagh's case.

98. Such actions raise serious ethical concerns, as attorneys have a duty to ensure the fair administration of justice and to avoid conduct that obstructs access to evidence. Case law consistently holds that an attorney's intentional suppression or concealment of evidence that could be favorable to an opposing party is a severe breach of ethical duties. For instance, the Supreme Court in *Brady v. Maryland*, 373 U.S. 83 (1963), established the principle that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. While *Brady* primarily applies to prosecutorial conduct, the underlying principle of fairness and the duty to disclose material evidence extends to all legal professionals.

99. Suppression of evidence occurs when a party intentionally conceals or withholds relevant evidence. *See e.g., United States v. Bagley*, 473 U.S. 667 (1985). Carbo actively suppressed evidence by failing to review or confirm what was sent to the court. This omission prevented the court and other parties from accessing potentially crucial information, thereby hindering the fair administration of justice. Ms. McGagh only learned that there were three tapes of the

incident but only one was shown in court, and that Carbo, while actively opposing Ms. McGagh and suggesting she is a liar, never saw the tapes, never spoke with Trebay, and frankly knew nothing about the case while insinuating he knew everything. This aligns with the principles of evidence suppression as Carbo's actions, or inactions, directly resulted in potentially exculpatory or crucial evidence being withheld from Ms. McGagh and the court.

100.     Furthermore, Rule 3.4(a) of the American Bar Association Model Rules of Professional Conduct, which many jurisdictions have adopted, explicitly states that a lawyer shall not "unlawfully obstruct another party's access to evidence or unlawfully alter, destroy or conceal a document or other material having potential evidentiary value." Carbo's admission that he did not review all three camera angles, coupled with his opposition to Ms. McGagh's claims, strongly suggests a violation of this rule. His actions deprived Ms. McGagh of potentially crucial evidence that could have proven her innocence, thereby undermining the integrity of the judicial process.

101.     The subsequent destruction of the missing footage while her case was under appeal further compounds the ethical breach, raising suspicions of intentional spoliation of evidence, which is also a serious offense. This combination of failing to review and potentially concealing critical evidence, coupled with its eventual destruction, represents a profound ethical failure and a severe moral dereliction.

**Verizon and Cellular Sales' Advertising Practices**

102.     Verizon and Cellular Sales' sophisticated and extensive advertising strategies, specifically designed to attract and engage women, create a heightened responsibility for customer safety within their retail establishments. When these "luring" tactics result in women entering environments where their safety is compromised, and harm ensues.

103.     Verizon's "Inspire Her Mind" campaign, created in conjunction with Makers, aimed to encourage parents to foster their daughters' interest in science by challenging societal norms that unintentionally discourage girls from STEM fields. This campaign highlighted statistics about girls' early interest in math and science versus the low percentage of women who major in those fields. While specific female celebrities for this campaign were not mentioned, Verizon has also featured Kate McKinnon in other commercials. Verizon's marketing strategies have also

acknowledged a shift in consumer sentiment, recognizing that people are tired of sexism and prefer companies that are conscious of gender equality.

104.    Lindsay Lohan Campaigns (2025): More recently, Lindsay Lohan has appeared in Verizon TV spots.

105.    One campaign, "Best Value Guaranteed: Summer: Free Phone-Samsung Galaxy S25," features Lohan discussing her "glow-up" and how she upgraded with Verizon to get a free phone. She uses Google Gemini (referred to as her "glam squad") to help with makeup choices.

106.    Another campaign, "Best Value Guaranteed: Summer: Price Lock Guarantee: 3 Year Plan," shows Lohan discussing how motherhood has changed her life and how Verizon offers flexible plans for families, with a guaranteed price for three years.

107.    "Women in Media" Event: Verizon Business CEO Tami Erwin hosted a "Women in Media" event aimed at empowering, inspiring, and supporting women in business. This digital event brought together leading executives from the media industry to discuss topics like leadership, mentorship, and work-life balance. This is part of a virtual, monthly event series in the Verizon Business Women in Business mentorship program.

108.    Here are some of Verizon's Super Bowl ads:

- 2024: "Beyoncé Breaks Verizon" featuring Tony Hale
- 2022: "Halftime Just Went Ultra" and "Going Ultra" for Verizon 5G Ultra Wideband.
- "Can't Blame the Lag" featuring Samuel L. Jackson and JuJu Smith-Schuster, and "Big Concert for Small Business" featuring Alicia Keys.
- "One More Sunday" featuring Eli Manning, and "The Amazing Things 5G Won't Do" for Verizon 5G Ultra Wideband with a song by Pearl Jam.
- ""Answering the Call: Saying Thanks" and "Remember the First Responders".

109.    Verizon also hosts a "Super Bowl FanFest" in various cities, transforming stadiums and venues into free celebrations with food, music, meet and greets with football heroes, and interactive games.

**Targeted Advertising to Women: Creating an Invitation and a Duty of Care**

110.    **Extensive Research into Women's Buying Habits:** It is a well-established fact that telecommunications companies, including Verizon and Cellular Sales, invest hundreds of

millions of dollars annually in market research. This research meticulously analyzes the demographic, psychographic, and behavioral patterns of consumers, with a significant focus on women, who often serve as the primary decision-makers for household technology purchases. This investment demonstrates a deliberate strategy to attract and engage female consumers.

### "Luring" Through Specific Advertising Campaigns:

111.    Verizon and Cellular Sales have historically employed and continue to utilize advertising campaigns specifically crafted to appeal to women. These campaigns often emphasize:

112.    ***Family Connectivity and Safety:*** Highlighting features that allow parents to track children, or maintain communication with family members, directly appealing to women's roles as caregivers and protectors. (e.g., Verizon's "The Network" campaigns often subtly emphasize reliability for family communication).

113.    ***Empowerment and Lifestyle:*** Portraying women as independent, tech-savvy, and in control, using devices to enhance their lives, careers, and social connections. (e.g., advertisements showcasing women seamlessly managing work and personal life with their devices).

114.    ***Convenience and Personalization:*** Promoting in-store assistance, personalized service, and product demonstrations, suggesting a safe and supportive retail environment tailored to their needs.

115.    ***Creation of an Implied Invitation and Representation of Safety:*** By actively and strategically targeting women with these sophisticated and often emotionally resonant advertising campaigns, Verizon and Cellular Sales extend a clear invitation for women to visit their physical retail locations. This invitation, coupled with the implicit assurances of a professional and safe commercial environment, creates a reasonable expectation among consumers, particularly women, that their safety will be prioritized within these establishments.

### VI. CLAIMS
### Claim 1: Intentional Infliction of Emotional Distress

116.    Ms. McGagh realleges and incorporates the preceding paragraphs by reference.

117.    Maryland law requires demonstrating intentional or reckless, extreme, and outrageous conduct causing severe emotional distress (*Courts v. Conyers*, 390 Md. 693 (2006)).

118.   Allowing an employee with a history of misconduct to interact with customers unsupervised, leading to the assault of Ms. McGagh, demonstrates a reckless disregard for her safety and behavior exceeding societal tolerance (*Harris v. Jones*, 281 Md. 560 (1977)).

119.   Willfully concealing evidence that could have supported Ms. McGagh's claims constitutes spoliation, obstructing justice, and exacerbating her emotional turmoil. Courts recognize evidence concealment as grounds for emotional distress claims (*Crea v. Baird*, 478 A.2d 1345 (Md. Ct. Spec. App. 1984)).

120.   Leveraging its position as a large corporation to create a power imbalance against Ms. McGagh, intensifying her perception of emotional distress. Corporations have a heightened responsibility towards customers (*Manikhi v. Mass Transit Admin.*, 758 A.2d 95, 113 (Md. 2000)).

121.   Advocating for criminal justice reform publicly while internally suppressing evidence and facilitating a malicious prosecution against Ms. McGagh demonstrates duplicity and bad faith, contributing to her suffering. Intentionally misleading conduct can support emotional distress claims (*Hoffman v. Board of Education of Prince George's County*, 125 Md. App. 43 (1999)).

122.   The cumulative effect of the Defendants' actions—permitting assault, destroying evidence, abusing power, and acting in bad faith—directly caused severe emotional distress, fulfilling the necessary causation element under Maryland law (*Bennett v. Board of Education of Baltimore County*, 109 Md. App. 69 (1996)).

### Claim 2: Negligence

123.   Ms. McGagh realleges and incorporates the preceding paragraphs by reference.

124.   Under Maryland law, to establish a negligence claim, a plaintiff must demonstrate that a duty was owed, that the duty was breached, and that the breach proximately caused the injuries sustained (*Baker v. Montgomery County*, 96 Md. App. 1 (1993)).

125.   The Defendants owed their customers, including Ms. McGagh, a duty to provide a safe store environment and adequately supervise their employees. This duty includes ensuring that employees in customer-facing roles do not engage in harmful or inappropriate behavior. Despite this obligation, the Defendant failed to adequately monitor and manage its employee, Glen Trebay, creating a dangerous situation that directly led to Ms. McGagh's assault.

126.    The Defendants had a nondelegable duty under the Restatement (Second) of Agency §
219(2)(b) to supervise their employees effectively, particularly those interacting directly with
customers. This legal principle establishes that an employer can be held liable for an employee's
tortious actions if the employer was negligent in supervising them.

127.    The Defendants breached this duty by neglecting to take appropriate action against Glen
Trebay after multiple witnesses reported his misconduct and video evidence confirmed his
inappropriate actions. This failure to act breaches the Defendants' duty of care to protect Ms.
McGagh and their other customers.

128.    The Defendants' negligence was the direct and proximate cause of Ms. McGagh's harm. By
failing to supervise Trebay adequately and not addressing the reported misconduct, the
Defendant allowed such harmful actions to continue, thereby facilitating the assault on Ms.
McGagh.

129.    The Defendants were or should have been aware of issues within the Baltimore County
criminal justice system that could compromise the safety of its customers. Their inaction in
implementing measures to safeguard against these known risks further demonstrates a breach of
duty.

130.    Additionally, the Defendants' concealment of surveillance footage pertinent to the incident
represents an act of spoliation of evidence. As established in *Pisano v. Atl. Coast Line R.R. Co.*,
194 Md. 242, 253 (1949), the destruction or suppression of relevant evidence may lead to
adverse inferences against the responsible party. This concealment illustrates the Defendants'
negligence in addressing their employees' misconduct and obstructs Ms. McGagh's ability to
seek justice.

131.    As a direct consequence of the Defendants' failures, Ms. McGagh suffered significant
emotional, psychological, and financial damages. These damages include, but are not limited to:

132.    Severe emotional distress, resulting in anxiety, depression, and posttraumatic stress disorder.
Medical expenses arising from injuries linked to the assault; Loss of income due to time taken
off work to recover physically and emotionally; Deterioration of personal and professional
relationships, damaging her reputation and career prospects.

133.    The cumulative impact of these damages underscores the Defendants' negligence and its
profound consequences on Ms. McGagh's life. Ms. McGagh respectfully requests that the court

hold the Defendant accountable for its negligent actions and award appropriate damages for her suffering.

## Claim 3. Vicarious Liability

134.   Ms. McGagh realleges and incorporates the preceding paragraphs by reference.

135.   The case of *Hoffman v. E. R. G. A. Corp.*, 309 Md. 218 (1987), illustrates that an employer can be liable for an employee's intentional torts if those acts were committed in furtherance of the employer's business or when the employee was acting within the scope of their duties.

136.   In the present case, Ms. McGagh asserts that the Defendants are vicariously liable for the actions of their employee, salesman Glen Trebay, who engaged in intentional battery and assault against her during her visit to the Defendant's store in July 2017.

137.   Glen Trebay acted as a Defendant's employee when interacting with Ms. McGagh. He greeted her and handled her phone while speaking as the defendant's representative.

138.   Trebay's actions, although unlawful and negligent, occurred while performing his job duties as a salesman. His alleged conduct—holding Ms. McGagh's SIM card hostage, imposing unwanted physical contact, and making inappropriate propositions—took place in the store and was intertwined with his role as a customer service representative. Trebay's inappropriate actions were ostensibly motivated by his position and ability to exercise power over Ms. McGagh's access to her property.

139.   Ms. McGagh suffered significant harm as a direct result of Trebay's actions. His refusal to return her SIM card despite her requests and the two-hour delay caused severe emotional distress, invaded her personal space, and constituted intentional infliction of harm. The Maryland court in *Pariser v. St. Paul Fire*, 247 Md. 275 (1967) confirms that an employer can be held liable for an employee's negligent conduct if the act is committed within the scope of their employment. Since Trebay's actions created an unreasonable risk of harm that directly affected Ms. McGagh, it meets the standard for negligence as defined in Maryland.

140.   Furthermore, Ms. McGagh's distress was compounded by the passive inaction of the other Defendant employees present during the incident, which indicates a failure of supervision and oversight. This further supports the claim of vicarious liability against the Defendants.

141.    Ms. McGagh respectfully asserts that the Defendants are vicariously liable for the negligent and intentional tortious acts committed by Glen Trebay during his employment, which directly resulted in the harm and emotional distress experienced by Ms. McGagh. As a result, she is entitled to recover damages for the injuries sustained due to this wrongful conduct.

### Claim 4: Violation of Due Process

142.    Plaintiff realleges and incorporates the preceding paragraphs by reference.

143.    Ms. McGagh asserts a claim for a violation of her due process rights, as guaranteed under the Fourteenth Amendment of the United States Constitution and Maryland law. This claim arises from the Defendants' actions and inactions, which deprived Ms. McGagh of her rights without due process of law.

144.    Under the Fourteenth Amendment, no state shall "deprive any person of life, liberty, or property, without due process of law." In Maryland, due process requirements are outlined in Article 24 of the Maryland Declaration of Rights, which ensures that individuals are afforded fair procedures when their rights or interests are at stake. The legal standard for a due process violation requires the following elements: 1. The existence of a protected liberty or property interest. The state action that resulted in the deprivation of that interest.

145.    There were no sufficient procedural safeguards surrounding the deprivation. Ms. McGagh had a protected property interest in her personal belongings, including her SIM card, which contained irreplaceable family photos and essential communications. Moreover, her liberty was jeopardized when she was wrongfully arrested and charged.

146.    The state action in this context involves not only Glen Trebay's unlawful detention of her SIM card but also the subsequent wrongful legal proceedings initiated against her following her report of the incident. These actions, taken together, constitute interference with her property rights and personal liberty. 3. Absence of Sufficient Due Process: Following the incident, Ms. McGagh reported the wrongful detention and harassment to authorities, yet instead of receiving protection, she was wrongfully arrested for perjury. This arrest occurred without due process as it was predicated on a mischaracterization of her attempts to report the assault and seek redress, despite the existence of video evidence substantiating her account.

147.    In Maryland, a negligence claim requires establishing duty, breach, causation, and damages (see *Bennett v. State Farm Fire & Cas. Co.*, 122 Md. App. 217 (1998)). The actions of Glen Trebay and the failure of the Defendants' employees to intervene represent a breach of their duty to act appropriately in the defense of Ms. McGagh's rights.

148.    Through its employees, the Defendant owed Ms. McGagh a duty to protect her from harmful conduct while on their premises. This includes ensuring customer safety and security, and maintaining a lawful environment.

149.    Ms. McGagh's complaint alleges that Trebay's behavior, characterized by unwanted physical contact and intimidation, constituted a significant breach of that duty. In failure to address Trebay's misconduct, the Defendants' employees neglected their responsibility to protect Ms. McGagh from unlawful behavior.

150.    The breach of duty by the Defendant and Trebay directly caused emotional distress and harm to Ms. McGagh. The relentless assault over two hours led to severe anxiety, distress, and subsequent wrongful arrest, which was compounded by the actions of the Defendants in failing to act against the initial assault and contributing to the criminal charges brought against her.

151.    The direct consequences of these actions have resulted in tangible and intangible harm to Ms. McGagh, including emotional distress, reputational damage, financial burdens from legal fees, and the psychological impact of being wrongfully arrested.

152.    The established criteria from *Patterson v. Maryland State Police*, 475 F. Supp. 2d 110 (D. Md. 2007), affirms that procedural due process protections must be afforded when a government agency takes steps that affect a person's livelihood or reputation without proper procedures.

153.    This is echoed in *Woods v. Richmond*, 691 A.2d 142 (Md. 1997), which recognized that preventing a person from seeking redress also interferes with due process rights, establishing a claim for procedural violations. The collective actions and omissions of the Defendants in this case constitute a violation of Ms. McGagh's due process rights as protected under both federal and Maryland law.

154.    As a result, Ms. McGagh seeks appropriate remedies, including damages for emotional distress and a declaration of her rights to prevent such violations in the future. The Defendants' failures to provide a safe and lawful environment for their customers demand accountability and redress.

## Claim 5: Quantum of Damages

155.    Ms. McGagh realleges and incorporates the preceding paragraphs by reference.

156.     Quantum meruit applies to claims where a party has received a benefit unjustly at the expense of another, entitling the wronged party to recovery.

157.     Ms. McGagh asserts that she is entitled to damages for the emotional, psychological, and reputational harm sustained due to the Defendants' actions.

158.    The Defendants' fault is evidenced by their negligent supervision, concealment of evidence, and obstruction of justice. The Defendants' hypocritical public stance on criminal justice reform while actively working against Ms. McGagh warrants significant damages.

159.    Ms. McGagh suffered severe emotional and financial harm, including loss of home, belongings, and career, necessitating substantial compensatory damages. Punitive damages are warranted to punish the Defendants' egregious conduct and deter similar behavior in the future.

160.    The Defendants' actions, marked by the negligent supervision of a problematic employee, the deliberate concealment of exculpatory video evidence, and collusion with law enforcement that led to Ms. McGagh's wrongful prosecution, demand significant compensatory and punitive damages. This misconduct demonstrates a shocking disregard for its duty of care and the principles of justice. The direct and foreseeable consequences for Ms. McGagh include wrongful imprisonment, financial ruin, and severe emotional distress. The Defendants' hypocrisy, of publicly promoting criminal justice reform while secretly subverting justice in this case, reveals a deeply troubling corporate culture that prioritizes self-preservation over ethics.

161.    The Defendants' fault is evidenced by their negligent supervision of Glen Trebay, who had a history of misconduct, directly contributing to the environment where the assault on Ms. McGagh occurred (*Restatement (Second) of Agency § 219(2)(b)*). This negligence was compounded by the Defendants' deliberate concealment of surveillance footage of the incident, constituting spoliation of evidence (*Pisano v. Atl. Coast Line R.R. Co.*, 194 Md. 242, 253 (1949)) and obstruction of justice, hindering the investigation and Ms. McGagh's defense. Furthermore, the Defendant actively facilitated the malicious prosecution by suppressing exculpatory evidence in violation of *Brady v. Maryland, 373 U.S. 83, 87 (1963)*, and colluding with law enforcement.

162.    The stark hypocrisy between the Defendants' public relations campaigns promoting criminal

justice reform and its private actions of suppressing evidence and facilitating the wrongful prosecution of Ms. McGagh demonstrates a conscious disregard for justice and warrants significant damages. This disparity highlights a corporate culture prioritizing profit and reputation over ethical and legal obligations.

163.    As a direct and proximate result of the Defendants' negligent supervision, spoliation of evidence, obstruction of justice, and malicious prosecution, Ms. McGagh suffered profound and multifaceted harm. This includes enduring wrongful arrest and imprisonment, leading to severe emotional distress, anxiety, and long-term psychological trauma. Additionally, she experienced devastating financial losses, including the loss of her home, personal belongings, and career, necessitating substantial compensatory damages to address these tangible and intangible harms and enable her to rebuild her life.

164.    Punitive damages are warranted in this case to punish the Defendant for its egregious conduct and to deter similar malicious and unlawful behavior by other corporations in the future (*BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996)). The Defendants' actions demonstrate a pattern of reckless indifference to their customers' rights and safety, and a willful disregard for the integrity of the legal system. The severity and multifaceted nature of the Defendants' misconduct, including the suppression of evidence and collusion in a malicious prosecution, necessitate a strong punitive response to ensure corporate accountability and reinforce ethical behavior within the legal and societal framework.

**Claim 6: Aiding and Abetting Torturous Act**

165.    Ms. McGagh hereby incorporates by reference all preceding allegations in this Complaint.

166.    Trebay, while acting in his capacity as the Defendant's employee, committed battery and intentional infliction of emotional distress against Ms. McGagh by unlawfully detaining her SIM card and subjecting her to unwanted physical contact and intimidation.

167.    The corporate structure and operations of the Defendants and their representatives demonstrated a failure to monitor and control their employees' conduct. By ignoring complaints and failing to rectify Trebay's wrongful conduct, the corporate Defendants tacitly approved his behavior, creating an environment conducive to continuing such misconduct.

168.    The Defendants had a duty to ensure a safe environment for consumers. Their inaction in the

face of Ms. McGagh's reported abuses, including refusing to address the complaints she raised about Trebay, constitutes active complicity in his harmful actions. Their failure to enact policy or disciplinary measures against Trebay amounted to providing support and encouragement for the ongoing tortious behavior.

169.    As a direct result of the conspiracy and the aiding and abetting of Trebay's actions, Ms. McGagh has suffered severe emotional distress and psychological trauma. She has faced significant barriers in pursuing justice due to her wrongful arrest and subsequent legal entanglements. The damage inflicted upon Ms. McGagh includes, but is not limited to, emotional pain and suffering, reputational harm, and ongoing psychological anxiety.

170.    In *Bishop v. Harkins, 222 Md. 419 (1960)*, the Maryland Court of Appeals established that an individual can be held liable for aiding and abetting a tortious act if they provided substantial assistance to the tortfeasor. The conduct of the Defendants, who did not intervene or protect Ms. McGagh from Trebay's extended assault, meets this standard.

171.    Additionally, in *Simmons v. State, 240 Md. 201 (1965)*, the court recognized that conspiratorial liability may arise when multiple parties engage in conduct that enables the underlying tort. Similarly, the Defendants' collective inaction effectively allowed Trebay's misconduct to continue unabated.

172.    The Defendants' acts and omissions amount to aiding and abetting civil conspiracy. Their tacit approval and failure to act constituted significant negligence. As a result, Ms. McGagh has suffered harm and is entitled to appropriate relief, including compensatory damages for her experiences during and following the incident.

### Claim 7: Spoliation of Evidence

173.    Ms. McGagh realleges and incorporates the preceding paragraphs by reference.

174.    This claim arises from the Defendants and their representatives' intentional and negligent failure to preserve and provide exculpatory evidence that would have exonerated Plaintiff Karen Campbell McGagh with respect to the actions of former employee Glen Trebay. This evidence includes, but is not limited to, video recordings from the Defendant's stores where Trebay worked, employment records, performance reviews, and surveillance footage from the days leading up to the July 2017 incident, which would have established a pattern of Trebay's

inappropriate behavior.

175.    In July 2017, Plaintiff McGagh suffered intentional battery and emotional distress due to Trebay's misconduct within the Defendant's store. Following the incident, the Defendant did not preserve evidence that could have supported her claims, including security footage showing Trebay's pervasive and inappropriate behavior towards other customers.

176.    The surveillance footage from the specific Defendant's store and footage recorded at other stores where Trebay was employed were either destroyed or not retained, in violation of company policy. This evidence was vital to establishing a pattern of Trebay's misconduct, and its absence severely hampered Ms. McGagh's ability to prove her allegations of assault and battery.

177.    The Defendants failed to retain Trebay's employment records and performance reviews, which could have demonstrated previous misconduct complaints or inappropriate behavior toward other customers. Such records are crucial for establishing a history of negligence on the part of the Defendants in maintaining a safe environment for their customers.

178.    Additional video footage from the days leading up to the incident would have illustrated Trebay's established pattern of harassment. The lack of this evidence constitutes spoliation that has significantly compromised the Plaintiff's case.

179.    Under Maryland law, the tort of spoliation occurs when a party intentionally destroys or fails to preserve evidence relevant to ongoing or potential litigation. In *Lerner v. Baltimore City Police Dept.*, 352 Md. 392 (1998), the court recognized that spoliation can create a presumption that the evidence destroyed would have been unfavorable to the party responsible for its destruction.

180.    The Defendants' duty to preserve evidence creates a foreseeable risk of harm to the Plaintiff. According to *Hoffman v. Baltimore City Police Dept.*, 662 A.2d 120 (Md. 1995), a plaintiff must establish four elements to prove negligence:

181.    The Defendants had a duty to preserve evidence relevant to Ms. McGagh's claims. The intentional destruction of evidence constitutes a breach of this duty, directly leading to the inability to establish liability claims against Trebay and the Defendant. As a direct result of the spoliation of evidence, Ms. McGagh suffered emotional distress, financial loss, and ongoing legal challenges.

182.    As a result of the Defendants' actions regarding the spoliation of evidence, Ms. McGagh has

suffered harm, including, but not limited to, emotional distress, reputational damage, and financial implications. The concealment and destruction of critical evidence that would have exonerated her from wrongful charges constitute apparent negligence and warrant punitive and compensatory damages.

### Claim 8: Assault

183.    Ms. McGagh realleges and incorporates the preceding paragraphs by reference.

184.    In July 2017, while visiting the Defendant's store in Maryland, Ms. McGagh experienced an intentional battery perpetrated by Glen Trebay, a salesman at that location. Trebay engaged in conduct that placed Ms. McGagh in reasonable apprehension of harmful or offensive contact, fulfilling the legal definition of assault under Maryland law.

185.    Specifically, Trebay removed Ms. McGagh's SIM card from her phone without her permission and refused to return it unless she acquiesced to his inappropriate requests.

186.    His physical proximity and unwanted touching, by sitting close to her and ensuring their legs were in contact, created an environment in which Ms. McGagh felt threatened and uncomfortable, leading to a reasonable fear for her safety.

187.    Trebay's verbal comments, including "I know where you live," only heightened her fear and anxiety, amplifying the oppressive nature of his actions.

188.    In Maryland, assault is defined as any intentional act that creates a reasonable apprehension of imminent harmful or offensive contact (see *Gordon v. State, 395 Md. 39 (2006)*). Trebay's actions were intentional, as he purposefully engaged with Ms. McGagh to intimidate and control her. He deliberately held her SIM card hostage, reflecting a clear intent to instill fear and discomfort.

189.    Ms. McGagh reasonably feared for her safety due to Trebay's actions. The unwanted contact and verbal threats created a credible apprehension of further harmful contact, which is sufficient to support her assault claim.

190.    Trebay's refusal to return the SIM card until Ms. McGagh agreed to his demands, combined with his physical proximity and unwanted touching, constitutes direct and threatening conduct. His invitation for her to join him for drinks and his knowledge of her home address further support the assertion that his conduct was offensive and threatening.

191.    While the essence of this claim is for assault, these actions also represent negligent behavior on the part of the Defendant and its employees for failing to intervene despite witnessing Trebay's unacceptable conduct. Under Maryland law, an employer can be held vicariously liable for the negligent or wrongful actions of its employees if such actions occur within the scope of employment (see *Hoffman v. Summerfield*, 968 A.2d 835 (Md. Ct. Spec. App. 2009)).

192.    As a direct result of Trebay's assault, Ms. McGagh suffered significant emotional distress, fear, and anxiety. The violation of her personal space and the threatening behavior inflicted psychological harm and caused her to incur costs seeking therapy for her emotional trauma.

## IX. Conclusion

193.    This lawsuit details disturbing tortious actions by Verizon Inc. and Cellular Sales, underscoring a profound breach of duty and an alarming disregard for Karen Campbell McGagh's welfare. The July 18, 2017, incident was not merely an isolated incident of employee misconduct but a culmination of systemic failures and intentional negligence that demand accountability. **Verizon's employee, Glen Trebay, assaulted Ms. McGagh, twotimes intimately,  against Ms. McGagh by unlawfully detaining her SIM card and engaging in unwanted physical contact and intimidation. This act, supported by** *Hoffman v. Housing Authority of Baltimore City*, warrants compensatory damages for emotional distress.

194.    Verizon and Cellular Sales are vicariously liable for Trebay's actions due to their employees' inaction during the assault, demonstrating negligence and a pattern of ignored abuse, as established by *Rogue v. Rockingham*.

195.    Verizon's public support for criminal justice reform contradicts its private inaction in Ms. McGagh's case, revealing hypocrisy. This warrants punitive damages, as supported by *Walsh v. State of Maryland*, to deter deceptive corporate practices.

196.    Verizon and Cellular Sales' tortious actions demonstrate negligence, intentional infliction of emotional distress, and obstruction of justice, for which they must be held accountable to ensure justice and deter future misconduct.

## X. RELIEF

1. Ms. McGagh seeks comprehensive relief from the Defendants for the assault she endured and the subsequent injustices. Verizon and Cellular Sales are culpable not only for their employee's assault on Ms. McGagh but also for their inaction as she was wrongfully imprisoned.

2. Adding insult to injury, Verizon, while championing criminal justice reform, actively worked to keep Ms. McGagh incarcerated for a misdemeanor, despite their stated opposition to long sentences for such offenses. They further compounded her suffering by hiring a lawyer who actively opposed her, cooperated with a corrupt State's Attorney's office, and presented false evidence. The executive team, despite being fully aware of the situation, did nothing.

3. The profound impact of these events on Ms. McGagh's life is undeniable. As Silliman's words acknowledge, her life is ruined: any knock on her door will induce fear of the police, the sight of a police car will cause her heart to sink, and her trust in the legal system is shattered. There is no justification for their actions, which were further exacerbated by their repeated refusal to mediate, thereby increasing her stress.

4. The only way to ensure Verizon changes its practices is through financial consequence. While no amount of money can truly compensate Ms. McGagh for her ordeal, holding them accountable in this manner is essential for justice and systemic change.

1. **Order Immediate Mediation:** Due to the pressing nature of the ongoing legal dispute, it is imperative that the court issues an immediate order for mediation between the involved parties. This action is crucial to fostering a resolution outside of a prolonged trial, which would undoubtedly incur significant costs and further strain on all participants. The sooner a neutral third party can facilitate negotiations, the greater the likelihood of reaching a mutually agreeable settlement that addresses the core issues of the case and prevents further escalation.

2. **Compensatory Damages for Intimate Assault**

Ms. McGagh requests $100 million each from Verizon and Cellular Sales to cover the financial and emotional losses caused by the assault. This includes:

- **Lost Income**: Money lost from being unable to work during recovery, and future income that will be affected.

- **Medical Expenses:** Payment for all medical and therapy costs, especially for psychological treatment needed due to the emotional trauma.
- **Property Loss:** Money to replace or repair damages to her home and personal items resulting from the incident.
- **Legal Fees:** Reimbursement for all legal costs from defending against wrongful charges after the assault.
- **Pain and Suffering:** Compensation for physical pain, emotional distress, and mental anguish caused by the assault.
- **Reputation Damage:** Money to address the harm to her reputation, social standing, and relationships due to the assault.

## 3. Punitive Damages

Ms. McGagh seeks an additional $100 million each in punitive damages to punish Verizon and Cellular Sales for their malicious conduct and deter them from doing similar things in the future. She also requests that they cover her law school tuition and fees, and donate $25 million to a foundation supporting wrongly convicted women.

## 4. Injunctive Relief

- To prevent similar incidents, Ms. McGagh asks the court to order Verizon and Cellular Sales to:
- **Implement Mandatory Policies:** Develop and enforce comprehensive training programs and policies to ensure customer safety, prevent employee misconduct, and adequately handle evidence.
- **Establish an Outside Impartial Complaint System:** Establish a fair and unbiased process for investigating customer complaints, ensuring individuals can report issues without fear of retaliation.
- **Public Acknowledgment and Apology:** Officially admit wrongdoing and publicly apologize to Ms. McGagh.

- **Forgotten Women Foundation:** Create a charitable foundation, funded with $25 million by Verizon and Cellular Sales, to support wrongly convicted women and advocate for criminal justice reform.

**5. Declaratory Judgment**

Ms. McGagh asks the court to declare that Verizon and Cellular Sales violated her rights under Maryland law and the Fourteenth Amendment of the U.S. Constitution.

**6. Prejudgment and Post-Judgment Interest**

Ms. McGagh requests that the court award interest at the highest legal rate on all compensatory damages before and after the judgment is issued.

**7. Recovery of Legal Fees and Costs**

Ms. McGagh seeks to recover all reasonable legal fees and costs related to this case.

**7. Additional Relief**

Ms. McGagh asks the court to grant any other just and proper relief to address her grievances and correct the wrongs she has suffered.

Very truly,

Karen Campbell McGagh
4307 Regalwood Terrace
Burtonsville, Maryland 20866